May it please the Court, my name is Ken Williams. I represent the plaintiffs and appellants in this case, the Hamul Action Committee, which is a community interest group, the Hamul Community Church and several residents of Hamul, a very beautiful rural community in San Diego. My counties would like it to stay that way. We are appealing the district court's decision to deny our request for a preliminary injunction and a writ of mandate to compel compliance with NEPA and to require them to prepare the environmental impact statement that they said they would prepare before constructing the casino. They made that statement they said they would prepare it before constructing the casino? Yes. I guess I'm just trying to clarify. I understand it's undisputed they said they would prepare it and it's undisputed that at the time they said that that was pre-construction, but there was never a deadline given for completing the process. Completing the report was there. I'm sorry, I didn't. Well, I just want to make sure I'm not misunderstanding your sentence. I don't think they ever told you by when they would prepare the EIS, did they? Or the EIS? I guess they didn't say that in the notice. That's what we say is the requirements of NEPA, that the EIS needs to be prepared at the earliest possible stage so that the public and my clients have a right to say. It's the EIS for what action? It depends on what federal action, right? Is it the EIS for constructing the casino? Yes. There are four actions here. And the reason I say that. I'm sorry, yes? Yes. Yes, it was. It's an EIS for constructing the casino. Why did they need an EIS for constructing the casino? Your Honor, if you look at the. Just give me an answer. I don't want to look at anything. Because they noticed that the public that they would do that for construction of a casino in 2000. That was back 12 years ago when we were talking about transferring 101 acres that is no longer in play. It is in play, Your Honor, because they've never withdrawn that. The, the, that. Is the construction going on on the 101 acres that belongs to the federal government? Part of it is. What, what's going, what's, what's being constructed there? The support facilities. If you look at the gaming management contract, they, that, part of that 101 acres is described in the adjacent property aspect of what they're going to manage. And part of the 100. I thought the access road might, might go over some of that land. The access road is also part of that land. Also, part of the construction of the casino is on land owned by the state, owned by the Wildlife Conservation Board. That wouldn't trigger an EIS, would it? Well, that's, no, that triggers an EIR and there's separate litigation on that right now. The, the, the initial EIS that was announced in 2003 actually uses the phrase construct a casino. This, and, and describes the same EIS. That EIS was never certified, never adopted by any agency. Ten years later, they say we're going to supplement that casino. They describe the same EIS, but they add the gaming management contract to the project description. And within the gaming management contract, Exhibit B to the gaming management contract is the gaming ordinance. So you end up with, and in the, in the 2013 notice, they say that this land, for the first time, is a reservation. Before, that was never said earlier. It's never been called a reservation until 2013. Counsel, I, can you point us in the record where it says that the casino is being built on lands that do not belong to, are not part of the Indian, not part of the tribe's reservation? Yes, Your Honor. If you look at the, the property description in the gaming management contract and you look at the, the, the public statements of Penn National, they say that we're, we're moving forward with the casino and construction on, of related facilities on the adjacent properties. The, if I could give you those sites that, rather than spend time at this point, I could give them to you in rebuttal. Sure. And the, the confusion in my mind comes from looking at the 2013 notice where the, where the government says that it will prepare the supplemental EIS for the, for the management contract, for the gaming management contract, which is being located on the tribe's reservation, which qualifies as Indian lands. So are you telling us that the, that the EIS is incorrect? There is no EIS. I'm sorry, the notice of, of the supplemental EIS. Is this inaccurate? It's not inaccurate because if you look at the supplemental information on the notice, it also talks about the 2003 EIS, which talks about The 2003 EIS clearly involved 101 acres, which is no longer in part of the project. Part of it is part of the project. And, but the more important part of the 2003 EIS is the part that says we are, this EIS will be on the construction of a casino. Right. That's, which was perfectly logical at the time when we had 101 acres that didn't belong to the tribe. Now, the supplemental EIS notice says it's being built on lands that belong to the tribe. That triggers, that's an entirely different kettle of fish. Oh, I, I think there's a misunderstanding as to the scope. I, well, I know there's a misunderstanding. I'm just trying to figure out what the origin of that is. It may be my misunderstanding, but I can't figure out what the problem is. Well, the 2003 EIS said, they didn't call it a reservation, but they said the entire casino will be built on trust land. They said that's the only And weren't they proposing to take 101 acres into trust? Right. No, no. They said that the additional, the fee to trust, there's two things going on there. There's 101 acres and that they're the existing trust land that they claimed they got in 1978. That deed that started all of this, that deed is the trust land that in 2003 they were going to build the casino. Now, in 2013, and they were going to have support facilities on, on parts of the 101 acres. The 2013 notice basically says the same thing, except makes two differences. Instead of calling it trust land, it says that 1978 deed is a reservation, which we disagree with. And they also say that some of the, they're very careful, but you can pull it out of the record that the adjacent properties, support facilities will be on the adjacent properties. It's part of the management contract. It's part of the loan agreement. It's part of their announcement. There's just not physically space on the, whether you called it in 2003, trust land or 2013 reservation land, there's not physical space on there to put all the other facilities, which are the wastewater treatment, the parking, all of those casino related facilities. And portions of the casino itself now, the way it's configured, and there's no maps that they provided, but what we can discern, portions of the casino itself is on parts of the 101 proposed acres. Now, that 101 feet of trust was never withdrawn or denied, but it is And you're going to, and you're going to supply us with the, with the evidence from the record that the casino is being constructed on the 101 acre parcel? of portions of it. Not, not, it's not like it's occupying the entire 101. I understand. It's a non-trivial fact. This is very important, at least on my scorecard, that's really important. So will you, to answer Judge Bybee's question, I'm going to. Yes, I will. For my part, I really want that site. And the evidence will be the, in the gaming management contract, the adjacent property, and there is a property description there. That property description is part of the property that was taken into trust or that they proposed to take into trust in 2003. And that, that adjacent property is part of the management contract, which they gave notice of in 19, in 2013. So that is connected to the trust property. So I, okay, so I'm, I'm now looking again at the 2013 notice to file a supplemental EIS, and I'm looking, I don't know how many paragraphs down, I'm about, I'm about five, five pages down, and a paragraph that begins, beginning between late 2003 and early 2006, the tribe revised their project to eliminate the fee-to-trust component. Now, is that wrong? That, is that fact just clearly erroneous? Yes, that's wrong. And, and it's contradicted by the gaming management contract and the statements by Penn National and in the public record that they're going to be constructing portions of the support facilities. How can the, how can the gaming management contract contradict that? I'm sorry? How can the gaming management contract contradict that? What occasion would it have? Gaming management contract is a contract with some outside agency around the casino. Right. Why would they specify what lane the casino is built on? I don't know why, Your Honor. I think that there was, there was an intention to convey one thing in the public notice and a reality when we act. They did not disclose, they did not provide us with a gaming management contract. There's no administrative record here. We had to obtain that gaming management contract through a Freedom of Information Act request. But they could go forward with constructing this casino without even having a gaming management contract. They could, they could manage the casino themselves, right? They could manage the casino themselves, but they, and they wouldn't need a management contract, but they would need a gaming ordinance. Okay. Forget the ordinance for a minute, because I'm just trying to take these things one at a time. And this circles back to Judge Kaczynski's question. How could a statement, even a misstatement in the gaming management contract impact the outcome here? They don't even need a gaming management contract, right? If you're, if you're relying on the gaming ordinance, that's something that I'm very interested in talking about as well, but it is a different argument. Right. I understand. The reason it would impact it is because the notice in the Federal Register is for a gaming management compact. And so if that is the compact that we have to look at to decide is what's the scope of the environmental impact statement, you look at that, that gaming management compact that they said they were going to do an EIS on includes the adjacent properties. Okay. So at the top of the hour, so to speak, Judge Kaczynski asked you whether you're going forward on this obligation to produce the SEIS pursuant to what is the triggering event. And I think you said it's the construction of the casino, not the gaming management contract. The triggering event for the clearest triggering event for the preparation of the EIS is the approval of the gaming ordinance in July of 2013. Okay. So, so let's talk about that as a major federal action. Let's talk about that for a minute, because if we're talking about that as the triggering event, then I would like you to, to help me out. There's a, there's a draft that was produced by the Gaming Commission, a draft NEPA statement that, that identifies in 2015 and identifies quite squarely that there's a conflict between complying with NEPA and complying with IGRA because it takes longer than 90 days to produce a environmental impact statement. But under IGRA, they only have 90 days to approve an ordinance. Isn't that right? They have 20, they have 90 days to approve a gaming ordinance. They approved it within 90 days. Right. But you can't do an EIS within 90 days. And my understanding of this, the authority that we have on this from the United States Supreme Court is where, where there's a conflict between NEPA and IGRA, NEPA gives way. Isn't that correct? Well, I don't know if that's correct, Your Honor, but I do know that this was not just this, the way this project was described in the notice, it included four major actions, not, not just, I think, I think in a sense that is correct as a practical matter. Right. Because, and, and it also is correct as with respect to the determination of the reservation as a practical matter, the Indian lands determination, the other two, the gaming management contract. So to tie that up, if I could, just so that we're all on the same page, I'm, I'm looking to, that tells me what I think is right, if you want to circle back, that where NEPA conflicts with IGRA, that they're not required to do an EIS triggered by the gaming ordinance. I understand your other two arguments to be attacks on whether this land is Indian land and whether the tribe is a tribe. Is that right? Yes, that is another issue that whether the, the land, the reservation land and whether the tribe itself, or whether, whether it actually is a tribe or whether it's a half-blood organization, and it voluntarily chose to become a half-blood Indian organization and not a tribe years ago. And so therefore, a major part of our case is that they're not even entitled to the, to a casino, much less. Is there another proceeding ongoing about tribal status that involves the Secretary of the Interior or the federal government in, in challenging that tribal designation? I'm not aware of any. Okay. There, there are just some references in the briefing to other proceedings that either are ongoing or have been, and I, I'm just wondering if that issue has been squarely teed up and challenged elsewhere. There's, I'm, I'm not aware of any other challenge of, of the, of the, whether or not the, this group of Indians is a federally recognized tribe entitled to a fee-to-trust transfer and a casino, as described by the Supreme Court in Carchieri. Well, the reason I'm asking is because I'm, I'm trying to figure out how this, these allegations about the tribal status or the, or the status of the land survive Big Lagoon Rancheria. Big Lagoon involved a collateral attack. We, we, we are making what I would call a direct APA attack, challenging the, the status of the tribe, the status of the land. This, this appeal involves one of our six causes of action, and, which is NEPA. The, the other five causes of action are a direct APA challenge to their, their, their ability to have fee-to-trust transfer under Carchieri and to the, their lands designation, designation. As I read this court's decision in Big Lagoon, it was a defense raised by the state 12 years later after, during compact negotiation, after the state had participated as an amicus, and it was a collateral attack. It, it was what you would call a collateral attack. It, and the court here in Big Lagoon said the, the result might have been different if the state, in that case, in 1993 or whenever it was, brought a, a direct APA challenge. That's what we've done here. So this is not a collateral attack. This is a direct attack. Thank you. Oh, I'm sorry, Your Honor. Thank you. We'll hear from the other side. Thank you, Your Honors. May it please the Court. My name is Frank Lawrence. I'm counsel for the tribally related defendants and appellees. I would like to reserve 30 seconds for a serve reply in the event that the opening argument so that I can have a chance to respond to it. The management contract, page 59 in the excerpts of record, says the beneficial owner, the tribe's the beneficial owner of six acres of reservation land located within the boundaries of the state of California held by the United States in trust for the tribe. That's the definition of the property that's the subject of the contract. What about the, what about the other facilities? What about the wastewater facilities and things like that? Are they on tribal lands? They are. Page 146 of excerpts of the record is the notice of intent at the bottom of page 146. It's describing the 10-year-old original fee to trust application and the EIR for that original request. And it says that the gaming facility has always been designed to be located on the reservation. However, other uses such as wastewater treatment disposal, et cetera, are to be located adjacent, on adjacent land north of the reservation. So is that not on reservation land? Let me keep reading, Your Honor, the next sentence. The reconfiguration of uses to place all features on the reservation together with the passage of time is what is encouraging the federal government to do a supplemental EIS. That's ER 146? ER 146. So I've got it. So I'm just a little confused. So the other uses that were going to be designed to be put on adjacent land north of the reservation, that's, those things are not being constructed on land off the reservation? Correct. They are being constructed on the reservation? Correct. Page 106 of the excerpts of record is the declaration of John Ridzic, who is the chief of the Division of Environmental for the Pacific Regional Office of the BIA. Page 106, paragraph 6 at the top, the tribe subsequently determined not to pursue the trust application. There is evidence in the record that the trust application has been abandoned. And the land, just to be, I just want to be clear. So the land north of the reservation, which the tribe did not pursue in the 2013 notice to file a supplemental EIS, was part of that 101, 101 acres, which is no longer part of the project? It was the 101 acres. The casino that's being built is being built on the reservation land. The wastewater treatment plant is on the reservation land. All, the parking is on the reservation land. On the what? On the reservation land, the parking. Parking. All of those supportive facilities that originally the tribe wanted to put on the 101 acres that was the subject of the FETA trust transfer has been moved to the six-acre reservation. Is it crowded? Yes. Is it in response to the appellant's comments during the environmental review process? Yes. Can I ask you a question about the ordinance? Yes. It really bothers me that the ordinance is not a major federal action. It seems to agree that approval of a management contract is because, after all, they don't really need a management contract. They don't need a third party manager, as far as I can tell, to operate this casino. That's correct, Your Honor. But that's why I get back to the ordinance and this draft report that we've found about the Gaming Commission's draft NEPA report and then this case law authority that I just referred to. So that when there's a conflict between NEPA gives way. Is that right? I'm not familiar with that case, Your Honor. It sounds right to me because IGRA is a more specific statute to this field, and Congress intended to completely preempt the field. And so on general principles, that would make sense to me. The issue of the gaming ordinance in North County Alliance, the Ninth Circuit held, that generic gaming ordinance, which is what the tribe in this case has, and that means we're going to, this is a gaming ordinance for gaming on our Indian lands. And that's what ours says. The North County Alliance panel said that's not a major federal action. That's not what that case was about. That's not what the case is about. That case is about whether there's an implied lands determination. There's a line of dicta that I think you're relying on, and I would be a lot happier if you're relying on this federal case that I'm talking about, because I don't think the question you're speaking to is squarely raised there. Okay. Understood. I think the issues are very clear in this case. I think, frankly, it should have been submitted on the briefs. I'm happy to refute everything that the opposing counsel said point by point, but really I'd like to know if the panel has any other questions. I don't know that you have refuted, and since you are here and you've come all this way, the first question is about the writ of Mandamus, and their argument is that the SEIS has been promised and that it's taking too long. Okay. The whole, at the center of the misunderstanding here is the plaintiffs and appellants' inability to distinguish between the gaming management contract as the federal action and the construction of the casino. The construction of the casino is a tribal action. Federal government is not involved in that. There's no federal funding. There's no federal approvals. There's no federal involvement, period. And the ordinance doesn't trigger. The ordinance does not trigger. The case, the New York case where an ordinance did trigger, was involved a fee-to-trust application for non-Indian land. It's a different, that's, it's a different case. Why does the gaming management contract, I think this is Judge Christin's question originally, was why does the gaming management contract even trigger the need for an EIS? Well, I guess it's been promised. I'd like to reserve some time for the government's counsel. I guess it's been promised. I'm not sure why it's been promised. I think it may be belt and suspenders, Your Honor. The plaintiffs have been filing, in my view, meritless legal challenges for 20 years to this project. And the statement that the tribe's status as a federally recognized tribe and the land is not federal Indian trust land, has never been litigated, is simply not correct. And we've cited... Well, that's not been litigated in any way. It has been. It's been challenged for, I don't know, a dozen years. In a dozen cases. What does it mean, it's been challenged but not litigated? Is that what you said? Did I mishear you? Well, the plaintiffs and appellants have, and those in privity with them, have brought a bunch of cases, Your Honor, that we've cited, I think, in our brief, that say the tribe's not a tribe. And they say that the reservation's not a reservation. And the federal courts in San Diego and Sacramento and Washington, D.C. and the Federal Court of Claims and this court in a prior case have all said, look, you cannot litigate the federal recognition of this tribe. That's been on the list of federally recognized tribes since 1982, by the way, in the exclusive discretion of the Secretary of Interior. You can't litigate that... That's the part we know. ...in the absence of the tribe. So it's been challenged and the tribe has been found to be a necessary and indispensable and now required party. The tribe's federal recognition was in 1982 at the latest. The fee to trust transfer of the land that is its federal Indian trust land was in 1978 and 1982. My question, has it been litigated? Well, in my view, it has been litigated, yes. Yes. Where was it litigated? It was litigated in the District Court in San Diego, in the Federal Court of Claims. It was before this court in the case we cited, an unpublished decision of this court. It's been litigated over and over again. It was litigated in the motion to dismiss the first amended complaint in this case by the District Court in Sacramento. They're on the list of federally recognized tribes. That presumptively establishes their federal recognition. It's a political relationship. Federal government, Congress delegated to the Secretary exclusive authority to recognize Indian tribes and the Secretary does that under the Federally Recognized Tribes List Act. I probably got that wrong, but co-counsel can correct me. Talk to me about the ordinance. Is the ordinance necessary to construct a casino? No. I don't believe it is, Your Honor. It's necessary to operate. And the gaming management contract's not necessary to construct or operate. But you wouldn't construct a casino unless you had the ordinance. I mean, what would be the point? What would you use it for? Parties? Well, Your Honor, I think if you're a tribal leader and you're going to embark on a project like this, there's a lot of things you have to do and one of them is you have to enact... You might be able to run a casino without a management contract. Yes. But you can't run a casino without an ordinance. Correct. Right? Correct. So you might say, well, we'll delay adopting a management contract later and if it doesn't work out, that's fine, we can... Manage it ourselves. And tribes do that. And tribes do do that. They do. But the one that's different, what is the federal action in approval of the ordinance? Well, in my view, it's a borderline ministerial action. I mean, IGRA, Indian Gaming Regulatory Act, is very specific and basically says, I think you can only disapprove an ordinance if it doesn't do one of these things. To me, it's almost a ministerial act. The ordinance comes out of a process between the tribe and the state. No, Your Honor. The ordinance is a creature of the federal statute of the Indian Gaming Regulatory Act. And if I'm... Who proposes it? Who promulgates it? The tribe promulgates it, is guided by the guidelines in the statute and the federal regulations that the National Indian Gaming Commission has promulgated and then submits it for federal review and approval. Does that have to happen after the compact? Does it have to happen after the compact? The compact was federally approved in 2000. Does it have to happen after the compact? I don't think so. There's no requirement in the statute that it do. I don't think I've seen that, but I've only seen it occur in that order. IGRA was passed in 88, so obviously it has to be post 88. It circles back to, I don't know if I'm right about this, but the thing that's bothering me may be the same thing that's bothering Judge Kaczynski, which it seems goofy, that that's not a major federal action. Well, if I can... And the only answer I've been able to come up with is this practical one, and then reverse engineering back to this case law that I have found here, where it says where there is indeed a conflict between NEPA and IGRA that NEPA gives way, and you can't do an environmental impact statement within 90 days. I'd like to reserve some time for my co-counsel if I might, but the short answer in my view to that, hopefully it's short, is that Congress said... Well, the Supreme Court said in Cabazon in 87, tribes can game on their reservations and states can't regulate it. The states weren't happy, and they Congress passed the Indian Gaming Regulatory Act. What did it do? It gave states a role. Congress said, we don't have a gaming commission in the federal government, but states do, and states where gaming is permitted can work cooperatively with tribes and work out the regulatory structure in these compacts. The environmental impacts of the gaming facility construction are heavily  And the tribe is fully complied. All their documents are on the tribe's website for the public to read. You've got a week's worth of reading there. I want to hear from the government. Thank you. May it please the Court. Elizabeth Ann Peterson for the United States. I would like to remind the Court that the district court concluded that JAC did not have standing to challenge this project as against the United States, and we believe that it should be affirmed on that basis. But I would like to address the questions that have come up with regard to the law here. The National Indian Gaming Commission has traditionally, as a matter of practice, treated any final approval of a gaming management contract as a major federal action. It, however, has never found that that approval had environmental impacts. So, in fact, although this is not in the record, the commission is currently working with CEQ to develop a categorical exclusion for cases where it's only the management contract that is a federal action involving a casino. In this case, of course, the circumstances are perhaps even unique because the original plan was to take a substantial parcel of land into trust and to have a much greater and more significant role in the project from the beginning. But now that it's down to approval of the management contract, it may be that the supplemental EIS requirement here is entirely unnecessary. It will, of course, provide the usual public disclosure and so on that may be of value to the state and the tribe in the development of the facility. It is unlikely to have an impact on the approval of the management contract. What is the understanding of the United States about where this casino is being constructed? Excuse me, I didn't understand. What's the understanding of the United States as to where the casino is being constructed? As we understand it, the entire project now is limited to the parcel that is in the tribe. And a formal determination that the operation of the entire facility is in the hands of the tribe. When you say in trust of the tribe, you mean that this is a tribal reservation. Yes. The tribe's reservation is the site of the entire gaming facility. And there will be a formal determination or verification that that is the case in the context of the final approval or disapproval of the management contract. But there is the request right now involves no acquisition of additional lands and the entire facility is expected to be on the reservation parcel. Counsel, I have a question about this statute. Forgive me. It does go back to the ordinance. But I just, I promise it's my last ordinance question. 25 U.S.C. Section 2710, 2710B2E requires that each class gaming ordinance certify that the tribe shall construct, maintain, operate, blah, blah, a gaming facility in a way that it protects the environment and the public health and safety. If that doesn't trigger an EIS, and I don't think it does for the reasons I've indicated, but if that doesn't trigger an EIS, how is this enforced or what does it mean that we have that statement there? It's enforced through the compact process, Your Honor. The ‑‑ But that goes back to the sequence, because the compact ‑‑ well, maybe I should just listen. But the compact has happened, and of course this would happen subsequently. So how does this circle back? The ordinance is tribal law that is required, that the United States has to approve. So it is now obliged by its own law to do the things that are in that ordinance. Right. But does that mean the tribe has to come to the Gaming Commission with an ordinance that specifies itself? The tribe is specifying what it's going to do to protect the environment, and then it's up to the Gaming Commission to approve or not approve that provision? No. The ordinance ‑‑ the ordinance need not specify many of the particulars, because an ordinance such as the one at issue here can predate any of those other steps. It's just a matter of the tribe understanding its obligations and committing to meet them. But this says the Gaming ‑‑ a classic gaming ordinance has to certify that the tribe is going to do those things. Is that what you're saying, but it doesn't have to specify how they're going to do them? Correct, Your Honor. I see. Okay. If that's the last question of the entire panel, then thank you very much. And we believe that the lower court's decisions should be affirmed in its entirety. Thank you. We are out of time. Would you like a minute for rebuttal? Yes, Your Honor. Thank you very much. To answer Judge Bybee's question, the adjacent property's references in the gaming management contract can be found at ER5969, and it's also referenced in the loan agreements that are linked to the ‑‑ they talk about four acres. I haven't ‑‑ I think it may be, as you said, Judge Bybee, that it's primarily for the access road, but it is that four‑acre parcel is that property for the access road at least is part of the original 101 acres or the part that they were going to ‑‑ or they have to take it into trust before they can build anything on it. And it remains part of the project? I'm sorry? And it remains part of the project? Is that your point? It is part of the project. So all we're talking now about, we're not talking about the wastewater facilities, we're not talking about the parking, we're not talking about any auxiliary buildings, the only thing we're talking about is an access road. There's an article that I was looking at by Penn National that talks about the wastewater facilities and all of that. It doesn't mention that. I remember personally comparing that to maps. So I can't ‑‑ and I did compare that to aerial photos that actually the ‑‑ the defendants had provided. So ‑‑ But that's all ‑‑ what we're talking about are those three references. But all of this then just goes to the question of construction of an access road? No, Your Honor. And I want to answer a question that Judge Christian made about ‑‑ and I think you also raised it, about why is a management contract, a proposed major ‑‑ why would it even trigger NEPA? And the answer is because they said it would. That's the answer. I mean, it could have been that they put ‑‑ Right. Once they say this is a proposed major federal action that requires an EIS, that discretion is over. Sure. But an EIS doesn't have to cover everything that goes on in San Diego County. Just because it's located in San Diego County. You can confine your EIS, for example, to how an access road impacts the environment without reference to the casino project. If you look at the 2013 EIS description of what they're going to study in the EIS, it includes land, water, socioeconomic, even Judge Mueller said that EIS is appropriate for a casino. It didn't say we're just going to have a very focused EIS that will just study whether or not management by the tribe versus management by Penn National. What it did on the last page of that notice, they described a comprehensive EIS. Well, let's suppose they overdescribed it. Why would we issue a writ of mandate to tell the government to do something that it probably doesn't have to do but may have voluntarily assumed the responsibility for doing? Well, because they told us they would do it. It's sort of the same answer to the proposed major federal action. If they put the public on notice that said we are going to do this, it's going to be a comprehensive EIS. And I disagree that it's just on the gaming management contract, but that's one thing we all seem to agree on. But that is a proposed major federal action because they said so. And the EIS, the scope of it is they have to follow through in because they said so in the federal register, notice to the public, notice to my client. My client sent a 22-page letter to them explaining some of the preliminary problems. The county of San Diego sent a two-page letter saying we noticed that you're going to do a comprehensive EIS. We'll reserve comments until we get a chance to look at the gaming management contract and the EIS. That is the notice to public. Once they make those decisions, and my client didn't even know that notice was coming out. Once they made those decisions, they now have a ministerial duty under NEPA. They exercise their discretion. They have a ministerial duty under NEPA to get that EIS done and circulated before the project proceeds. And the project is, if you look at the totality of it, includes the construction of the casino because it incorporated the 2003 summary. It includes the gaming ordinance. It includes the gaming management contract. And it includes the 2013 Indian lands determination, which they had to make after North County, pursuant to regulation 559.1. They now have to make an Indian lands determination. That's a new regulation that wasn't at issue at the time of North County, right? What's that? That's the newer regulation. Although it was described by this Court afterwards and said, and this Court said, if that regulation had been in existence, the result here might be different. That regulation is in existence, and the result in this case should be different. You are appealing the denial of preliminary injunction, right? And the denial of the RITA mandate. And what practical effect would issuance of any of that relief have right now? The casino is built, right? No, it's not. No, it's not. It's partially built. They're continuing to build it. It will not be built until late next year. You mean it won't be finished? It won't be finished. It won't be finished. I mean, the walls are up. I think there's framing up. I haven't seen it recently. There's framing. There's a lot of construction activity. It took the district court four and a half months to deny our injunction. We immediately brought an emergency motion for injunctive relief, which this Court unfortunately denied. So they're continuing to construct. So we'd be disrupting construction in the midst. What's the benefit of that? Your Honor? All it does is add costs to the construction, right? The hole in the ground is there. Whatever. What would be the effect of that? There will be economic costs, but they assume that risk. They're in the gambling business, so they assume that risk. I understand. The question is, what would be the point of it? The point of it would be that it would give my clients and the public a chance to comment while there's still a chance to modify aspects of the project and to provide meaningful mitigation. And the point of it is the whole point of NEPA. NEPA is a we are denied our procedural rights and to comment early enough, there's still opportunity to comment, provide meaningful comment, provide, suggest mitigation measures before it goes forward. If we wait till it builds out, then I think your question is valid. If this truly was a built casino, completed casino, then we've got a different issue then. I mean, maybe we go back to our other five causes of tribe in 1934. Those issues we'd go back to. But right now, the reason we brought a preliminary injunction, a very focused one, was because we thought, or I thought, maybe wrongly, that it would be the NEPA would give us a chance, that the environmental review would get a pause and we could do the other, get on with the rest of the case. But it's still very, very important because this casino is not constructed. This, there's still opportunity for effective mitigation based on meaningful public comment. And that's my client's rights that are being depleted every day. Now, there are economic costs, and this Court has held that when you balance those two, especially where the rights of the public are being diminished and will be forever lost, the economic loss have to give way to give the public, there will be a pause. And if they prevail, they will continue. The NEPA won't stop it. It may just affect the project. Thank you. Thank you. We'll stand up and tell us how far along the project is. The topping out ceremony has already happened, Your Honor. The pictures in the excerpts of record from page... Sorry, the what? The topping out ceremony in construction when the highest point of the structure is completed. It's called a topping out ceremony. My dad was a general contractor, so I grew up with it. Doesn't that usually happen when we're looking at a bunch of I-beams? Isn't that pretty early on in the process? No, there's finished stucco, colored stucco on the outside of the casino. Is there a complete roof on this? Yes, there is. All the windows are in? Yes. I don't know if all the windows are in, Your Honor. It's a complete structure. The roof is complete. The eight-story underground parking structure is complete. There's excerpt of record from 122 to 130 were submitted in June. 122 to 130. There's photographs that were taken a week or two before I filed a brief. The casino is set to open in June. And obviously, it's a significant piece of construction. So their interior, their finishing interior, there's drywall up. I think I missed these first. You know, the fundamental confusion is between approval of the management contract and the NIGC has said, we're going to supplement the EIR. And all that language about what's going to be in it is just quoting NEPA. They're just saying, we're going to do a NEPA on this. Okay. Thank you. Thank you, Your Honors. Case is solved. You may stand and submit it. Thank you, Your Honor. You're adjourned.
judges: Kozinski, Bybee, Christen